IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 1:26-CR-00038 |
| | : | |
| v. | : | (Judge Neary) |
| | : | |
| MATTHEW BAIR | : | (Electronically Filed) |

**BRIEF IN SUPPORT OF
MOTION TO REVOKE DETENTION ORDER**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Solerno*, 481 U.S. 739, 755 (1987).

Defendant, Matthew Bair, by his attorney, Beatrice Diehl, respectfully requests that this Court revoke his current detention order and release him on bond pursuant to the Bail Reform Act, 18 U.S.C. § 3142 and *United States v. Solerno*.

**ARGUMENT**

**I.      Legal Standard**

If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly. 18 U.S.C. §3145(b). When the district

court acts on a motion to revoke or amend a magistrate judge's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release. *United States v. Delker*, 757 F.2d 1390 (3rd Cir. 1985).

Under the Bail Reform Act, 18 U.S.C. §3142(b), a judge "**shall** order the pretrial release of the person on personal recognizance…**unless** the judicial officer determines that such release…will endanger the safety of any other person or the community." (emphasis added). Even then, detention is not automatic. The judge then "**shall** order the pretrial release of the person…" "subject to **the least restrictive further condition, or combination of conditions**, that such judicial officer determines will **reasonably assure** the appearance of the person as required and the safety of any other person and the community…" 18 U.S.C. §3142(c) (emphasis added).

The legislative history of the Bail Reform Act states:

> [T]here is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial.

S.Rep. No. 225, 98th Cong., 1sr Sess. 6-7 (1983), reprinted in 1984 U.S. Code Cong. & Ad. News 1, 9 (Supp. 9A).

2

Under this statutory scheme, "It is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1983), *as reprinted* in 1984 U.S.C.C.A.N. 3182, 3189); see also *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.)"

## II. This is not a presumption case, the government bears the burden and failed to meet its burden.

Mr. Bair is not a danger to the community, and the government failed to overcome the presumption of release. The Bail Reform Act contains a presumption of detention in certain allegedly dangerous crimes, but Mr. Bair's charge under 18 U.S.C. §922(g) is not one of them. The Court must therefore start with the presumption that he be released with no conditions. To detain Mr. Bair as a danger to the community, the government must prove by clear and convincing evidence that there are no conditions of release that will reasonably assure the safety of the community. 18 U.S.C. §3142(f); *United States v. Patriarca*, 948 F.2d 789, 792-93 (1st Cir. 1991). "Clear and convincing evidence means proof that a particular defendant in actuality poses a danger to the community, not that a defendant in theory poses a danger." *Id*. "Clear and convincing evidence" is required in constitutional cases when a heightened standard of proof is required such as when there is a "significant deprivation of liberty" and "due process requires the state to justify confinement by proof more substantial than a mere preponderance of

3

evidence." *Addington v. Texas*, 455 U.S. 745, 747-48 (1979). Mr. Bair has to prove

nothing to preserve his liberty interests – that was on the government.

"Dangerousness" must be established by "clear and convincing" evidence, i.e.,

evidence that "provides 'a high degree of certainty' as to danger." *United States v.*

*Chimurenga*, 760 F.2d 400, 405 (2nd Cir. 1985).

Mr. Bair is not dangerous nor did the government prove that he was dangerous.

The government and the Magistrate Judge relied on a series of uncharged,

offensive acts or speech alleged by proffer to argue Mr. Bair's dangerousness if

released. The alleged acts summarized are as follows:

- "Early 2024": Mr. Bair posting "shoot your local judge," and then Mr. Bair telling a journalist that he lived near a federal judge's home and asking if the journalist had a healthy respect for a Tauras Judge. This is concerning and worrisome, but nothing violent occurred afterwards.[1]
- March 8, 2024: Mr. Bair responded to a Telegram user stating, "now I'm planning things and not just Walmart shootings." This is not illegal nor is it a specific threat. It is unclear what is being said.
- March 23, 2024: Mr. Bair was with an undercover officer when the officer placed a brick with "RWB" written on it outside of a Pennsylvania State Police barracks. They both verbally said, "white power." This is free speech. Offensive, aggressive, but legal and protected by the U.S. Constitution.
- July 16, 2024: Mr. Bair posted a picture with an Inject Division flag hanging on the John Brown Raid headquarters stating, "rest in flames." This is similarly free speech.
- October 9, 2024: Mr. Bair told an undercover agent he had a 9mm handgun for "propaganda videos." This is free speech, and no 9mm handgun was ever found. It is not indicative of violence or dangerousness.

---

[1] Unfortunately, this is a sign of the political times. Mr. Bair perhaps believed tough rhetoric is not a threat. Journalists have been called out by people with much more power and ability than Mr. Bair. "And if the reporter doesn't want to tell you, it's bye-bye, the reporter goes to jail. And when the reporter learns that he's going to be married in two days to a certain prisoner that's extremely strong, tough, and mean….." U.S. President Donald Trump.

- October 2024: A photo, unconfirmed whether Mr. Bair was in the photo, was posted with two individuals with guns and an Inject Division flag posed in front of a barbed wire fence. This is again not illegal and not indicative of anything other than men posing with guns. (For example, U.S. Representative Thomas Massie went viral in 2021 for his Christmas card, posing with his entire family, all with assault rifles and yet, he has not been locked up for posing a danger to society).



- November 2024: Mr. Bair posted a video of a gate of an electrical substation stating, "What do we have here? Stay tuned." Later, Inject Division (not Mr. Bair) posted a photo of three individuals with guns and a flag outside an electrical substation. This is similarly free speech and for those who stayed in tune, nothing happened. This is less egregious than say a comment such as "When the looting starts, the shooting starts."[2]
- November 15, 2024: the CEO of Terrorism Research and Analysis Consortium received a text message from someone suspected to be Mr. Bair stating "fuck with Cole, pay the toll," and her personal information and another text stating "you are not safe." It is unclear from the proffer why this is believed to be from Mr. Bair. Importantly, the CEO remained safe.

---

[2] A quote by U.S. President Donald Trump on May 29, 2020, made on Twitter during the George Floyd protests. President Trump was not locked up for being a danger to society.

- November 26, 2024: Mr. Bair spoke to an undercover cop stating he was going to burn down the John Brown house, but then said he was joking. One can make upsetting jokes, and the Brown house was never burnt down (it is unclear if Mr. Bair has ever even actually been to the home).
- January 2025: Mr. Bair allegedly posted a picture of firearms and other belongings in a car stating, "Come with me, come with me, gotta get back to DC." There is no indication Mr. Bair ever was in D.C. with guns nor any evidence he ever threatened anyone in D.C. with guns.
- April 4, 2025: Mr. Bair allegedly posted on Telegram, "Burn abortion clinics, shoot judges, bully queers, kill pedophiles." This is horrendous speech, but it is free. You cannot yell fire in a crowded theater, but you can post loathsome beliefs and comments online without meaning to cause harm or be required to be locked up.

Importantly, not a single of the above ever resulted in a charge let alone conviction and none of the threats were ever followed through on. Combing through posts and conversations of someone terminally online, particularly someone who posts odious opinions can make anyone seem bad. But the Bail Reform Act does not dictate detention based on someone's perceived moral failings only on their dangerousness. This collection of online rhetoric and in some cases, walking up to the line between threat and free speech (such as the brick) is a lot of smoke, but no fire. Just as important as the government's allegations above is a contemporaneous timeline of peace:

- 2024: Mr. Bair did not shoot judges, journalists, or even so much as shove someone.
- March 8, 2024: Despite his online hyperbole no mass turbulent or violent activity occurred.
- March 23, 2024: No brick was thrown by Mr. Bair nor was a person threatened with a brick.
- July 16, 2024: The John Brown House still stands.

6

- October 9, 2024: No allegations that Mr. Bair ever threatened someone with a 9 mm gun.
- November 2024: No power stations are blown up or shot up, no CEOs are harmed by Mr. Bair, the John Brown House still stands.
- January 2025: There is no shooting in D.C. by Mr. Bair or his compatriots.
- April 2025: Mr. Bair did not burn down any abortion clinics, shoot anyone, bully the LGBTQ community, or kill anyone.

Instead, during this time, Mr. Bair was working until he was laid off and found another job. He was actively involved in his children's lives (when they lived in Spring Grove, PA, he was part of the PTA). He bought a home in September 2025. He was the primary breadwinner in his family. He was active in his church, Sacred Heart Parish in York. He was a family man. Throughout 2024, 2025, and into this year, the FBI and police knew where Mr. Bair was and had their eyes on him. They did not think it was imperative for the safety of the community to arrest him or incapacitate him after any of the above alleged incidents nor even in the 12 months since the misconduct alleged in the March 4, 2026, indictment. Yet now, when the only difference is the fact of an indictment, Mr. Bair is considered dangerous. He is not, because despite his rhetoric, his rhetoric did not ever lead to results.

**A. Mr. Bair's history and characteristics show that he is not a danger to society.**

Mr. Bair's criminal history, save for a pending DUI, all stems from a decade ago or longer, when he was in his early to mid-twenties. He believes that one of his parole violations was from the 2017 resisting arrest charge, of which he was nolle prossed – likely because of the excessive use of force used by the police at that

time (he had his hands up while the police repeatedly beat him with bare fists).[3] This criminal history is old, he has not been convicted of anything in 12 years (and received a fine a decade ago). This criminal history does not include any violent actions or activity, no assaults, no guns, and not even drugs. The fact that he has a history at all is not a reason to find him a danger and certainly not when he has old criminal convictions all relating to theft.

Mr. Bair has extremely close ties to the community. As discussed above, he owns his own home with his long-term girlfriend and their three children. He was employed at the time of his arrest, he was actively involved in his children's lives, and an active member of a local church. He has lived in York, PA, almost his whole life, and his entire extended family lives in the area. Although he was discharged from the U.S. Marine Corps, he entered after high school, served several years prior to his bad conduct discharge. This shows his dedication to the country – at one point he raised his right hand, swore an oath to defend the Constitution, and put his body in peril while deploying with the United States Marines.

Although defendants must be looked at as individuals in determining their risk upon release, it is important to look toward the future to understand the risk of

---

[3] See Caitlin Sinett, *York police officer fighting with man caught on camera goes viral*, FOX43, May 23, 2016, York police officer fighting with man caught on camera goes viral | fox43.com.

dangerousness, and putting the individual in context of data and society is helpful to determine future dangerousness. Every person in pre-trial proceedings has a pre-trial risk assessment (PTRA score). This PTRA score has been validated and revalidated as an empirically based risk-assessment. Based on the scoring sheet found online (Ex. 2), as best as Defense Counsel can calculate, Mr. Bair is a Category 2. While there is a low risk of anyone on pre-trial release committing crimes (see section B below), those that fall in PTRA Category 2 are substantially less likely to reoffend while on pre-trial release than others, with only 5 percent of those in PTRA Category 2 being rearrested for any offense and only .7 percent were rearrested for violent offenses.[4]

**B. Statistics show that it is extraordinarily rare for defendants on bond to recidivate.**

AO statistics show that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2021, 99% of released federal defendants nationwide appeared for court as required and 99% were not arrested for new crimes on bond.[5] Moreover, when release rates increase, crime and flight do not. A near-perfect compliance rate on bond is seen equally in federal

---

[4] Thomas Cohen, et al., *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary*, 82 FED. PROB. 3, 23-29 (Sept 2018); Federal Probation.
[5] App. 1, AO Table H-15 (Sept. 30, 2022). These high compliance rates have remained remarkably consistent over time, both before and after the pandemic. *See, e.g.*, Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, available online (showing a nationwide appearance rate of 99% and non-rearrest rate of 98%).

districts with very high release rates and those with very low release rates.[6] Even in districts that release two-thirds of all federal defendants on bond, just 1% fail to appear in court and 1% are rearrested while released.[7] The chart below reflects this data:



In this district, released federal defendants appeared for court 99.8% of the time in 2021, and only 2.33% of defendants were rearrested on release for a felony or misdemeanor offense. *See* App. 1, AO Table H-15. Yet despite the statistically low risk of flight and recidivism that defendants like Mr. Bair pose, the government

---

[6] The data showing near-perfect compliance on bond is illustrated in the chart, "Federal Clients on Bond Rarely Flee or Recidivate (2016-2021 Data)." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending September 30, 2021. *See* App. 2, AO Table H-14A (Sept. 30, 2021), available online. The failure-to-appear and rearrest rates for these districts were calculated using App. 1, AO Table H-15. About flight, the ten federal districts with the lowest release rates (average 20.00%) have an average failure-to-appear rate of 1.6%, while the ten districts with the highest release rates (average 64%) have an even lower failure-to-appear rate of 1.1%. *See* App. 1; App. 2. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 0.8%, while the ten districts with the highest release rates have an average rearrest rate of 1.1%. *See* App. 1; App. 2.

[7] *See* App. 1; App. 2.

recommends detention in 71% of cases nationwide and in 62.6% of cases in this district. *See* App. 2, AO Table H-3. These detention requests are not tailored to the low risk of flight and recidivism that defendants in this district (and elsewhere) pose.

This is a non-presumption case. Mr. Bair has an old, non-violent criminal history. His only allegations of dangerousness involve speech. He was monitored from early 2024 through his arrest in 2026 by law enforcement without any concern that he was a danger to society (or determining there was a necessity to lock him up). He has a low PTRA score (the second lowest) which has been validated as a good predictor of future criminality, and as such he is highly unlikely to reoffend. The government has not met its burden to show that Mr. Bair is dangerous.

### III. There are conditions of release that will reasonably assure the appearance of Mr. Bair and the safety of the community.

As discussed above, Mr. Bair is not a danger to society. However, even "dangerous defendants" are entitled to be released when conditions to be imposed can "reasonably assure" the safety of the community. *United States v. Alston*, 420 F.2d 175, 178 (D.C. Cir. 1969) ("The law requires reasonable assurance but does not demand absolute certainty, which would be only a disguised way of compelling commitment in advance of judgment.)" The standard assumes that some degree of risk of dangerousness will always remain, yet the defendant should be released on

appropriate conditions that are intended to minimize – not eliminate that danger.

Thus, "danger to the community" is not required to be eliminated by the condition

or combination of conditions imposed by the Court for release to be appropriate

under the law. The District Court in Maryland, for example, determined that

serious risks to the community do not always require detention:

> As evidence of Davis's danger to the community, the government points to his alleged drug dealing and his unlawful sale of firearms to a confidential informant over a six-month period last year. These are serious allegations, and the alleged conduct presents a danger to the community. However, rare is the case in which there will be no evidence of danger to the community based on alleged criminal conduct. The plain language of the statute requires the Court to evaluate the "nature and seriousness of the danger." This language makes clear that there are different types of dangers and varying levels of seriousness. Selling narcotics, for example, is different than identity theft, which is different than carjacking. Having identified the specific nature of the danger and how serious it is, the Court then must consider available release conditions that will address those concerns and "reasonably assure" the safety of the community. The statute requires a "reasonable assurance," not a "guarantee." *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985). At times, there will be no such conditions. Here, there are.

*United States v. Davis*, 449 F.Supp. 3d 532, 539 (D. Md. 2020).

Indeed, the Bail Reform Act itself contemplates that upon determining personal

recognizance is not enough to reasonably assure the safety of the community, the

next step is not detention but rather looking to conditions of release. The

government failed to prove that no conditions can reasonably assure the safety of

12

the community. There are a variety of conditions that can reasonably assure the safety of the community:

- A third-party custodian. In this case, Mr. Bair's girlfriend, Ms. Stephany Feiser. She was denied the opportunity to testify at the detention hearing but is ready and available to testify at any additional hearing.
- Location monitoring and a curfew.
- Requiring Mr. Bair work full-time.
- If there is a concern about his online activity, prohibiting him from accessing or posting on certain sites. This is possible with computer-monitoring software which probation has access to given that this is a common condition for those who have alleged to have committed sex offenses.
- A prohibition on traveling outside the Middle District of Pennsylvania.
- Periodic check-ins with probation (in addition to random visits by probation).

There is no reason to believe these prohibitions and strict conditions could not reasonably assure the safety of the community given Mr. Bair's background. He should not be locked up pre-trial without a conviction when in the past three years, despite his concerning speech, he has not taken any violent actions and has been observed by law enforcement with no significant incidents. He should be released with a set of conditions to continue to be a father and family man, go back to work, and appropriately assist with his defense from outside of prison walls.

## **CONCLUSION**

This is not a close case. This is not a presumption case. This is not a case where Mr. Bair is charged with a non-presumptive crime but has a high PTRA score or a recent string of concerning convictions. This is a case of a man who ran

his mouth online with aggressive rhetoric but no follow up (while under the watchful eyes of the FBI the entire time). This is exactly the type of case where the Bail Reform Act dictates that an accused be released. His due process rights, presumption of innocence, statistics, and the statute require his release.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Beatrice F. Diehl*

BEATRICE F. DIEHL, ESQUIRE
Assistant Federal Public Defender
Attorney ID #FL 0124667
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
*Beatrice_diehl@fd.org*
*Attorney for Matthew Bair*

</div>