IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

UNITED STATES OF AMERICA          :
                              :   CASE NO.
        v.                :   1:26-CR-00038-1
                              :
                            :
MATTHEW BAIR                :   (Judge Neary)

TRANSCRIPT OF DIGITALLY-RECORDED PROCEEDINGS
INITIAL APPEARANCE/ARRAIGNMENT/DETENTION

Held before CHIEF MAGISTRATE JUDGE DARYL F. BLOOM
March 11, 2026, Courtroom Number 5B
Sylvia H. Rambo United States Courthouse, Harrisburg, PA

APPEARANCES:

CARLO D. MARCHIOLI, ESQUIRE
United States Attorney's Office
1501 North Sixth Street
Harrisburg, PA  17102
    For the United States

CURT W. SCHULZ, ESQUIRE
Federal Public Defender's Office
100 Chestnut Street, Suite 306
Harrisburg, PA  17101-2540
    For the Defendant

MADDISON DUNCAN, U.S. PROBATION OFFICER

    Proceedings digitally recorded; transcript produced by
computer-aided transcription.
_____
Wendy C. Yinger, RMR, CRR
Federal Official Court Reporter
wendy_yinger@pamd.uscourts.gov

2

(Digital recording begins.)

THE COURT:  The next matter before the Court is United States of America versus Matthew Bair, at this court's docket number 1:26-CR-38.  Good afternoon, Mr. Bair.

THE DEFENDANT:  Good afternoon, Your Honor.

THE COURT:  Mr. Bair, you're here today in federal court in the Middle District of Pennsylvania based upon an indictment that was returned by the grand jury on March 4, 2026.  That indictment has one count of unlawful possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1).  Do you have a copy of that document, sir, that charging document?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  Very well.  Now, the purpose of today's proceeding is I want to go over a number of things with you.  I want to talk to you about the charge that's contained in the indictment as well as the maximum penalty.  I want to talk to you about your constitutional rights.  I want to talk to you about whether or not you wish to retain counsel, whether or not you'd like me to consider appointing counsel to represent you. We'll talk about some future dates in this matter.  And then, ultimately, we'll make a determination about whether or not you should be released or detained pending the resolution of this case.  Do you understand?

THE DEFENDANT:  I understand, Your Honor.

3

THE COURT:  Now, the first right I want to talk to you about is your right to remain silent.  You're not required to make any statements.  If you do decide to speak, you can stop speaking at any time.  Also, if you decide to speak, you can have an attorney with you.  The important thing that you know is that any information that you say could be used against you.  Do you understand that you have a right to remain silent?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now also, I believe, Mr. Bair, that you were born in the United States, but, nonetheless, I'm obligated to tell you that if you were not born in the United States, you have a right to request that Mr. Marchioli or another federal law enforcement official notify the consulate office of the country of your nationality to let them know that you've been arrested.  In some cases, there's a treaty or other international agreement where that's done automatically.  But do you understand that if you are not a United States citizen, you have a right to consulate notification?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  Now, the next right I want to tell you about is a very important right, and that's your right to the assistance of counsel.  You have the right to retain counsel or to request that counsel be appointed to you if you cannot obtain counsel.  Would you like me to consider appointing counsel to represent you?

4

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And to that end, I see that you've completed a financial affidavit.  Is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And is all the information on that financial affidavit true and complete?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And is that your signature at the bottom left-hand corner of that document?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And, Mr. Bair, if you could give me just a moment while I review that, document, please.

THE DEFENDANT:  Yes, sir.

(Pause)

THE COURT:  And, Mr. Bair, I am going to determine that you do qualify for court-appointed counsel.  And, Mr. Schulz, I believe you're covering, but is the federal public defender's office able to accept an appointment?

MR. SCHULZ:  It is, Your Honor.

THE COURT:  All right.  Very well.  I'm going to sign that order, Mr. Bair, appointing the federal public defender's office to represent you.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, the next thing I'd like to do is I'd like turn to that indictment that's right in front of you.  And

I'm going to ask -- relatively scan it, but I'm going to, nonetheless, ask Mr. Marchioli to generally summarize the information that's on there as well as provide the maximum penalty for this offense.  I'll get you to listen very carefully as it's important that you understand both the charge against you as well as the maximum penalty.  Mr. Marchioli.

MR. MARCHIOLI:  Thank you, Your Honor.  The indictment charges one count of unlawful possession of a firearm by a previously convicted felon in violation of Title 18 of the United States Code, Section 922(g)(1).

It specifically alleges that on February 28, 2025, in York County, Mr. Bair unlawfully possessed at least one firearm, and specifically lists two firearms, an Aero Precision rifle and a Ruger pistol.

The maximum penalties upon conviction are imprisonment for up to 15 years, a 250,000 dollar fine, a term of supervised release of up to three years, and a 100 dollar assessment.

THE COURT:  Thank you, Mr. Marchioli.  And, Mr. Bair, do you understand the allegations against you as well as the maximum penalty for that offense if you are convicted of that offense?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And based upon the summary that was provided, do you waive a formal reading of the indictment?  And

6

what a formal reading would be, I would ask Mr. Schulz to read every word that's on that document.

THE DEFENDANT:  That's not necessary, Your Honor. We'll waive.

THE COURT:  Very well.  Mr. Schulz, are you prepared to enter a plea on behalf of Mr. Bair at this time?

MR. SCHULZ:  I am, Your Honor, not guilty.

THE COURT:  Okay.  A plea of not guilty on the charge contained in the indictment will be entered.  The record will reflect that the defendant has been arraigned on this indictment at this time.

This matter is scheduled for jury selection and trial on May 4th, 2026, at 9:30 a.m., here in Harrisburg, Pennsylvania, before Judge Neary, and that's in Courtroom No. 7A.  So, Mr. Bair, your next scheduled court appearance is here in this building, and that's in Courtroom No. 7A.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And, for counsel, pretrial motions are due no later than four weeks prior to trial.

Now, the next thing I need to address is the issue of detention.  Do the parties have a copy of the pretrial services report?  Mr. Marchioli?

MR. MARCHIOLI:  Yes, Your Honor.

THE COURT:  And Mr. Schulz?

MR. SCHULZ:  Yes, Your Honor.

THE COURT:  And I'll note that the parties may retain the pretrial services report.  However, please note that it can otherwise not be reproduced or disclosed to any other party.

And I see that the government has filed a motion for detention in this matter.  This is not a presumption case, I don't believe, Mr. Marchioli, but I'm happy to hear from you at this time.

MR. MARCHIOLI:  Thank you, Your Honor.  The basis for the government's motion focuses on Mr. Bair's risk of -- presents a danger to the community.  We're not alleging that he presents a risk of flight based on the information that we currently know.

With respect to the one charge in the indictment, Your Honor, that's based on an event that occurred on February 28th, 2025.  Mr. Bair went to a shooting range in York County with a friend, and he fired both of the weapons listed in the indictment.  He is captured on video firing those weapons, so the strength of the evidence underlying the charge in the indictment is strong.

Additionally, Your Honor, at the time of Mr. Bair's arrest today, which occurred at his residence in York County, he was interviewed by agents.  He acknowledged inside the residence, there were three additional firearms.  And I should say that the two firearms that underlie the charge in the

8

indictment, we believe belong to the friend that he was at the shooting range with.

But today, at the time of his arrest, he acknowledged there were three firearms inside the residence.  And during a search of the residence, agents did find two handguns as well as one rifle.  Those firearms could lead to additional charges for which the strength of the evidence would also be very strong.

Beyond those gun charges, Your Honor, this investigation has involved significant investigative steps that have uncovered repeated communications that Mr. Bair engaged in from 2024 through at least the first part of 2025 that are strong indications of potential violence and certainly attempts to intimidate many other people.  And I think this additional evidence provides relevant considerations for the Court to consider and weighs in favor of detention.

This additional evidence pertains to communications that the government has obtained, many of which were communicated via Telegram.  This investigation also entailed an undercover component.  And I'll get into that in a moment, Your Honor.

THE COURT:  Mr. Marchioli, I'm just gonna ask you just to pause there just for one second.  Mr. Schulz, I should have asked you, are you prepared to proceed or do you want Ms. Diehl to --

9

MR. SCHULZ:  I'm prepared to proceed, Your Honor.  I do know, obviously, when we get there, when I ask for his release, in the alternative, you know, I do have a third-party custodian that I would be calling, not today.  But I don't think -- I mean, that's if the Court deems it's necessary, because it is the least restrictive conditions, but I am prepared to argue today --

THE COURT:  All right.

MR. SCHULZ:  -- unless in the event the Court, you know, has to hear from the third-party custodian in order to make a decision.

THE COURT:  Very well.  I just wanted to give you the opportunity before I continue.

MR. SCHULZ:  Sure.  I appreciate it.

THE COURT:  All right.  Mr. Marchioli, please continue.

MR. MARCHIOLI:  So, by way of proffer, Your Honor, in general terms, the investigation has uncovered that Mr. Bair has been a member of various accelerationist groups, including 2119 Inject Division.  Accelerationism refers to a white supremacist belief that the current system is irreparable and without an apparent political solution; therefore, violent action is necessary to precipitate social and governmental collapse and start a race war.

Now, I'll review some of the specific items that we

uncovered during this investigation.

In early 2024, a journalist in North Carolina interviewed Mr. Bair about Mr. Bair's involvement in 2119 and then published an article about Mr. Bair and other members of 2119.  During the interview, they discussed one of Mr. Bair's online posts, which included the words, quote, shoot your local judge, close quote.  Mr. Bair suggested that judge referred to a specific firearm, specifically, a Taurus Judge.  But he also noted that he is, quote, close, close quote, to a federal judge's home in New Jersey where the judge's son was fatally shot in 2020.  Mr. Bair was almost certainly referring to the killing of Judge Esther Salas' son, a New Jersey federal judge.

A few days after this interview, Mr. Bair sent a veiled threat to the journalist saying, quote, you have a healthy respect for a Taurus Judge now, yes?  Keep fishing for minors and we'll keep shooting our local judge, close quote.

On March 8, 2024, a Telegram user posted, quote, Al-Qaeda works so well because they had a simple rule.  Before any funding, any propaganda, anything, you had to do action.  You weren't allowed to brand yourself as Al-Qaeda until you do action, close quote.  Mr. Bair, using the Telegram name Cotton, replied, quote, and now I'm planning things and not just Walmart shootings, close quote.  Mr. Bair's post likely referred to the leader of Inject Division, Coleman Blevins, who was arrested in May 2021 for plotting a mass shooting at a

11

Texas Walmart.

Next, Your Honor, a video shows Mr. Bair and an undercover Pennsylvania State Police Trooper arriving at a PSP barracks on or about March 23, 2024.  Both men are masked.  At Mr. Bair's suggestion, which was not captured on video, the undercover officer placed a brick in front of the entrance.  The letters RWB were written on the brick.  RWB likely referred to Revolutionary White Brotherhood.  As he placed the brick, the undercover said, quote, white fucking power, close quote.  Mr. Bair then said, quote, white fucking power, close quote.  Use of the brick was almost certainly a reference to a 2023 incident in Florida in which a white supremacist threw a brick at a Jewish center.

Next, Your Honor, on July 16, 2024, Mr. Bair, this time using the Telegram name Sons of MVP TRaKtifa, posted a picture of the John Brown Raid headquarters, which are located in Washington County, Maryland.  The picture also showed that an Inject Division flag was hanging on the building's railing, and the post included the statement, quote, rest in flames, close quote.

In October 2024, Mr. Bair informed an undercover officer that he had a 9 millimeter handgun for propaganda videos.  Mr. Bair said that he obtained the gun from a friend and the gun is the ultimate, quote, burner, close quote, and just as good as a ghost gun since it is not registered to him.

Your Honor, I'll pause there for a moment.  In his post-arrest statement to agents, Mr. Bair indicated that one of the handguns that was located in his residence had been obtained from a friend of his at some point previously.

Next, Your Honor, also in October 2024, Mr. Bair, again using the Telegram name Sons of MVP TRaKtifa, posted a picture of two individuals, one of whom was believed to be Mr. Bair, armed with guns with an Inject Division flag in front of a barbed wire fence with a sign that read, quote, danger, no trespassing, close quote.

In November 2024, Mr. Bair, again using the Telegram name Sons of MVP TRaKtifa, posted a short video showing a gate at an electrical substation.  The post also said, quote, what do we have here?  Stay tuned, close quote.

The next day, a Telegram channel associated with Inject Division posted a photograph of three armed individuals outside an electrical substation along with two Inject Division flags draped on the station's barbed wire fence.  The electric company First Energy informed the FBI that the video and photo showed an electrical substation in Dillsburg, Pennsylvania.

On November 15, 2024, in a text message to the CEO of an entity called the Terrorism Research and Analysis Consortium, and this is an entity that maintains a database of terrorists, terrorist groups, and hate groups, Mr. Bair sent an image with the Inject Division name and the statement, quote,

fuck with Cole, pay the toll, close quote.  Cole was, again, a reference to Coleman Blevins, Inject Division's leader who was arrested in May 2021 for threatening a mass shooting at a Walmart in Texas.  This text message came shortly after Mr. Bair on Telegram, again using the name Sons of MVP TRaKtifa, docs the CEO providing her birth date, addresses, and phone numbers, with the warning, quote, you are not safe, close quote.

Additionally, on January 16, 2025, that CEO received at her house, a paper that said, quote, Inject Division sends their regards, close quote.  And that contained a swastika in the middle.

Next, Your Honor, during a meeting on November 26, 2024, in which an undercover officer was present, Mr. Bair said, quote, you know the John Brown house?  I'm gonna burn that fucking thing down, close quote.  Mr. Bair also discussed his research about the house and how he planned to no longer conduct electronic searches related to the house so he could conceal his efforts from authorities.  Additionally, Mr. Bair discussed where he would park and that he would need to walk 7 to 15 miles from that location to the house.  Although Mr. Bair noted at one point that this was a joke, he also said that after thinking about it more, he started to take it more seriously and began looking into making it a reality.

Next, in January 2025, Mr. Bair, using the Telegram

14

name Paxtang Boys TRaKtifa, posted a picture showing two firearms, a tactical vest, bear mace, and several road flares in the back of his vehicle.  The post included the caption, quote, come with me, come with me, gotta get back to DC, close quote.

Finally, Your Honor, in a post on Telegram on April 4, 2025, Mr. Bair, using the name John Brown's Bastard Children TRaKtifa, said, among other things, quote, burn abortion clinics, shoot judges, bully queers, kill pedophiles, close quote.

So, Your Honor, obviously, all of those communications and interactions bear heavily on Mr. Bair's character and his propensity towards violence.  And even if he were not willing or intending to carry out acts of violence, they certainly are indications that he has threatened numerous people over the past one to two years, and I think weigh heavily in favor of his detention pending trial.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Marchioli.  Mr. Schulz.

MR. SCHULZ:  Yes, Your Honor.  Your Honor, Mr. Bair, 36 years old, has grew up, spent his entire life in York County at the -- he graduated from Central York High School.  At that point in time, he joined the Marine Corps.  He was in the Marine Corps -- he was in the Marine Corps from, it looks like about five years he was in the Marine Corps.  He did two tours

while he was in the Marine Corps where he did combat tours in both Afghanistan and Libya.  He did have a theft larceny for which he was discharged, discharged from the Marines.

After discharge, Your Honor, since that time until current, for the most part, he has been working continuously. He recently just got a job.  And this was his third day where he was working as a forklift operator for ES3 in a food warehouse in York.  He had been collecting unemployment for not even, I think, started in January, because he had gotten laid off.  So, he has employment history, consistent employment history since he, since he has finished with the Marines.

He does support both -- he has a girlfriend who is currently collecting, I guess, disability.  They have three children.  One of them is his own, a one-year old.  They also have -- she has two older children.  But they are a family and he supports all three of them.

So, he has ties to the community.  He's also involved in his church, Sacred Heart Parish in Spring Grove, which is outside of York.  So, he essentially has ties to the community. The government has even stated that he is not a flight risk.

So, the only issue before the Court -- and, again, the burden of proof is on the government to show by clear and convincing evidence that, essentially, there are no conditions, no conditions that the Court can impose to insure the safety of the community.  Again, as the Court stated, this is not a

16

presumption case.  So, they bear the burden not only by clear and convincing evidence that he's a danger, but that there are no conditions that the Court can impose short of detention.

And, in this case, we are here for an unlawful possession of a firearm, and the firearm being used at a gun range, as they indicated, shooting at a gun range on February 28th of 2025.  I want to highlight, 2025.  This is over a year gun.  Over a year ago.  And there is nothing about just the mere having guns that's going to make a person a danger to the community.  A lot of people in this country have guns.  That doesn't make them a danger to the community.  There is no allegation that I've seen here of him using guns against somebody, firing at somebody, nothing of that sort.

You look at his criminal history.  The criminal history is there's no conviction of any kind of assault, aggravated assault, anything like that.  His convictions are essentially an access device fraud.  They're theft-related cases.  The military, the one that he got charged there, is larceny.  It's a theft-related case.

They went into a whole thing of these alleged acts, which I have no evidence of.  We're taking it at face value.  But all of that has nothing to do -- they're saying that all of these threats are made, but yet we have a charge of possession of a firearm that occurred in February of 2025.

And a lot of these threats or these, basically, I

guess, you know, it's an argument for another day if we're talking about speech, if we're talking about whether or not it crosses the line of free speech or who you associate with or what groups you associate yourself with.

But all these events, we're talking July of 2024, October of 2024, November of 2024. The most recent one, I think, that he indicated was April of 2025. But here we are in March of 2026, and any of these actions that they're saying or these threats or wanting to burn a place down, to my knowledge, nothing has been ever carried out. To my knowledge, John Brown's house hasn't been burned down.

So, you know, to say that the person is a danger, they're now asking for detention in March of 2026, when they're saying all this stuff has shown that he's a danger occurred in early 2025 and into 2024, you have to question the validity of that argument, the strength of that argument.

So, when there is no presumption and there's no evidence that he's actually done anything physical towards anybody other than the fact he just owns a firearm, and the allegation with him having prior convictions, it's not enough when we have the Bail Reform Act which favors release when there is not -- when there is no presumption here. The burden of proof on them is not, you know, it's clear and convincing on the danger, it's an upper level of what they have to show to do this extreme measure of detaining somebody. And I don't think

18

that they have met that.

As stated, Your Honor, I mentioned earlier, he has a job. Hopefully, he can hold onto that. He has a home that he owns, 2600 Windsor Road. He resides there with Stephanie Fizer (phonetic). They've been together, I believe, eight years. She couldn't make it here today. I don't think it's necessary, Your Honor, under the facts here, what's alleged, that a Court has to -- it's not required that a third-party custodian, that's something that is up to the Court. Again, the Court has to give conditions that are the least restrictive. If the Court feels it necessary to have a third-party custodian in this case, we could certainly produce Ms. Fizer (phonetic) for that role.

But with the facts that we have here, it's a case where there is no presumption, I think it's appropriate to release him with conditions that deems necessary, something that will allow him to keep working his job so he can support his family.

THE COURT: All right. Thank you, Mr. Schulz. Mr. Marchioli, it is the government's burden. Do you have anything further to add?

MR. MARCHIOLI: No, Your Honor.

THE COURT: So, Mr. Bair, I want to go through a couple of things as it relates to detention.

THE DEFENDANT: Yes, Your Honor.

19

THE COURT:  First, at all times, you're entitled to a presumption of innocence; and, second, as Mr. Schulz correctly points out, under the Bail Reform Act, pretrial detention is an exceptional step.  What that essentially means is, it has to be the least restrictive conditions be imposed to assure two factors; one is the safety of the community, and the other is the appearance of the defendant, you, at future proceedings.

I've taken into consideration, this is a case that does not have a presumption.  When I look to the risk of flight, it's a preponderance of the evidence standard.  And when I look to the danger to the community and others, it's a clear and convincing standard.

I'm required to look to, there's a particular section of law that I look to, to determine whether or not it's appropriate.  And it really comes out to be a balancing and I determine four general factors under the Title 18, United States Code, Section 3142(g).

The first factor is the nature and circumstance of the alleged offense.  And, in this case, it's the offense of unlawful possession of a firearm.  And I find that really, while it's significant and serious, that factor would not weigh in favor of detention.

The next factor I look to is the weight of the evidence against the defendant.  As indicated by Mr. Marchioli, there is indication that you were at a shooting range with a

friend and that's on video.  I believe that relates to the two firearms that are contained in the indictment.  There are, my understanding, additional weapons that were located in the home.  And I'll address those shortly.  So, the second factor, I find would weigh in favor of detention.

The next factor, and I say factor, but it's really conglomerate of a number of factors; for example, the history and characteristics of the defendant.  And this includes, specifically, the defendant's physical and mental condition, family ties, employment, length of residence in the community, community ties, past conduct, criminal record, history of drug or alcohol abuse, record of appearance at prior court proceedings, and whether defendant was on conditional release of some sort at the time of the alleged offense.  And I find that when I review those factors, they weigh both for and against detention.

And, specifically, I'll note that you do have -- you've been a lifetime resident in the community.  I would note that you have employment.  You certainly have family ties, which includes, I believe, two biological children.  I would note that in terms of drug abuse, and my understanding, and mental health, those answers were not declined, so I don't weigh those one way or another.  But also -- and those are the factors that are for.

But the factors that are against are, for example,

your dishonorable discharge or bad conduct discharge from the United States Marine Corps.  That is a factor that I consider.

The other factors are, and I just want to be clear and note these, there are at least a couple adjudications of delinquency.  And those occurred when you were age 15.  I am not going to consider those and provide those with weight because they were, one, they were from a protracted period of time, but also when you were a minor.

However, I am going to provide some weight, some consideration to the fact that you have a number of other criminal convictions; for example, the conviction that ultimately led to your discharge from the United States Marine Corps.  You were sentenced to 22 months confinement for the wrongful sale, destruction, damage of government property.

Thereafter, only a short time thereafter, there is access device issued to another who did not authorize it.  Ultimately, you pled guilty to that offense and you were sentenced to 234 days to 23 months confinement.  What I find most significant, as it relates to that charge, is that there are two parole violations that are alleged in response to that; one, you received 465 days confinement, and the other, you received 369 days confinement.  So, we have two parole violations, which is significant.  I also note that a bench warrant was issued in that case, and I find that significant as well.

Thereafter, only within a very short period of your first arrest on April 30, 2014, there's another arrest on August 4, 2014. And, ultimately, you entered a guilty plea to criminal mischief and damage of property and were sentenced to 6 to 12 months confinement. But what, again, is significant, and probably some of the most significant, is that there was, again, a bench warrant that was issued on December 12th, 2014.

And so, now we have two bench warrants that were issued and we have two parole violations. I would note as well -- so that kind of, when I consider all of that conglomerate of factors, it really weighs both for and against.

The last factor that the Court is required to consider is the nature and seriousness of the danger to others or to the community. And that factor, I find heavily and significantly weighs in favor of detention based upon the government's representation.

The government has indicated a number of things, and I'm not going to go through and indicate each, but certainly there is indication of significant threats of violence. And I would also note, in addition to the threats of violence, there appears to be, based upon that representation, the possession of firearms. And I indicated previously that I was going to note the firearms also in the home, that you would be prohibited from possessing as well.

But there's also, in addition to just the rhetoric,

23

there's also the conduct that's infused with that rhetoric. What I mean by that is, there were, as represented by the government, there were a number of occasions where an individual that is represented to be you is armed and with the flag and also with these threats.

And so, based upon that information, I am going to order your detention in this matter pending trial. And I note that, as it relates, the government did not indicate orally that you were a flight risk. I believe, nonetheless, in the motion for detention, there may have been -- okay, it's just based upon the danger to the community as opposed to a flight risk. I think there is some flight risk, but the government did not indicate that flight risk.

But based upon all the information that I have, and, Mr. Bair, what I am stuck with is, I have to make this judgment about prospective, prospectively, look in the future and see whether or not there's a danger. And I can only do so by examining wholistically everything that I have before me. And that includes your prior criminal history, the conduct, and the weapons as well. And it certainly has been determined that you're able to secure firearms outside of yourself individually, even though you're otherwise, as alleged in the indictment, prohibited from possessing a firearm.

So, the government's motion for detention will be granted, and I am going to order your detention pending trial

24

in this matter.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, the last thing I need to do, Mr. Bair, is I need to provide what we refer to as a Brady notice. And it's something that I'm required to provide in writing, and that will be placed on the docket, and also provide orally. And I'm gonna place that on the record now.  So, if you can just bear with me just for a moment while I read.

Pursuant to the October 21, 2020, amendment to Rule 5 of the Federal Rules of Criminal Procedure, the Court provides the prosecution and defense counsel with the following notice that confirms the disclosure obligation of the prosecutor under the Supreme Court's decision of *Brady versus Maryland*.  Under *Brady*, the prosecutor must produce material evidence in its possession, custody, or control favorable to the accused, which includes both exculpatory evidence and information which may impeach government witnesses when that evidence is material either to guilt or to punishment.  Such disclosures must be made in a timely manner in order to allow the use of the exculpatory information in the defense of the case.  The failure to comply with this due process obligation may result in dismissal of charges, exclusion of evidence, or sanctions against counsel.

Mr. Marchioli, does the government understand its obligation?

25

MR. MARCHIOLI:  Yes, Your Honor.

THE COURT:  And, Mr. Marchioli, is there anything further that this Court needs to address on behalf of the United States?

MR. MARCHIOLI:  No, Your Honor.

THE COURT:  And, Mr. Schulz, is there anything further that this Court needs to address on behalf of Mr. Bair?

MR. SCHULZ:  No.

THE COURT:  And, Ms. Duncan, is there anything further that this Court needs to address as the probation office is aware?

PROBATION OFFICER:  No, Your Honor.

THE COURT:  Okay, thank you.  Have a good day.

COURTROOM DEPUTY:  Court is adjourned.

*(Digital recording ends.)*

26

*CERTIFICATION*

*I, Wendy C. Yinger, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript to the best of my ability of the digitally-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.*

*/s/ Wendy C. Yinger*
*Wendy C. Yinger, RMR, CRR*
*U.S. Official Court Reporter*
*Wendy_Yinger@pamd.uscourts.gov*

*(The foregoing of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)*